UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

PADDA HOTELS, LLC,                                              No.  12-13786 TA
       Debtor.

## **MEMORANDUM OPINION**

The Debtor owns a Hampton Inn (the "Hotel") in Clovis, New Mexico, encumbered by first and second mortgages held by State Bank of Texas (the "Bank").  Purchased just before the Great Recession of 2008, the Hotel ran into financial trouble, resulting in a foreclosure action and this bankruptcy case.  The Debtor filed a plan of reorganization[1] that proposes to pay the Bank and other creditors 100% of their claims, plus interest.  The Bank objected on feasibility grounds, and also filed a motion to dismiss the case.[2]  On January 29, 2014,  the Court held final hearings on Plan confirmation and the Motion to Dismiss.  For the reasons set forth below, the Court concludes that the Plan should be confirmed and the Motion to Dismiss denied.

II.      Findings of Fact

The Court makes the following findings of fact:

1.      The Debtor, a New Mexico limited liability company, owns the 55-room Hotel, which is located in Clovis, New Mexico.  The Hotel has been operated as a Hampton Inn since at least 2007.

2.      Ms. Jasbir Kaur and her husband formed the Debtor and bought the Hotel for $4,500,000 in late  2007.

---

[1] Amended and Restated Chapter 11 Plan, doc. 76, (the "Plan").
[2] Motion to Dismiss Chapter 11 Proceeding, doc. 58 (the "Motion to Dismiss").

3. The Kaurs invested their life savings ($800,000-$900,000) to buy and refurbish the Hotel, and financed the balance of the purchase price with a $2,252,600 first mortgage loan from Millennium State Bank of Texas (the "Millennium Loan") and a $1,613,000 second mortgage loan from the United States Small Business Administration (the "SBA Loan").[3]

4. The Bank now owns both loans.

5. Mr. Kaur thereafter became gravely ill from a brain hemorrhage and now is completely disabled. The sole source of income for the Kaur family, including their 19-year old daughter, is about $900 in monthly disability payments to Mr. Kaur and $4,500 monthly management fees paid to Ms. Kaur by the Debtor.

6. The Debtor was hit hard by the 2008 financial crisis, and has been recovering ever since.

7. The Bank filed a foreclosure action in January 2012, prompting the Debtor to seek Chapter 11 relief on October 16, 2012.

8. The Kaurs mortgaged their California house to raise money to refurbish the Hotel, and have since lost the home to foreclosure.

9. The Debtor retained Hotel Management Solutions ("HMS") in April 2009, after the Hotel failed a franchisor inspection. Under HMS' management, the Hotel has passed all subsequent franchisor inspections.

10. The Hotel's revenues went from $1,125,831.42 in 2011 to $1,229,518.88 in 2013, a 9.2% increase. During that time the occupancy rate held steady at about 72.4%.

---

[3] The loans are reflected in proofs of claim 4 (SBA Loan) and 5 (the Millennium Loan).

11.     Since 2011 the Debtor's average daily room rate increased from $76.60 to $84.50, about a 10% increase.

12.     HMS prepared a Marketing Plan for the Hotel (the "Marketing Plan").  The Marketing Plan discloses, among other information, that the current average daily room rate for the Debtor's competitors in Clovis is $89.14.

13.     The Debtor's plan is to increase its average daily rate to that of the competition (about a 5% increase), while keeping occupancy, and therefore operating expenses, steady.

14.     The Plan proposes to pay the Millennium Loan and the SBA Loan in full, with 4.75% interest, amortized over 30 years.  The Plan also proposes to pay general unsecured creditors 100% of their claims over time, plus interest at 3%.

15.     The Debtor objected to the Bank's secured claims.  Despite the pending claim objections, the parties stipulated that the Bank's claims could be temporarily allowed for voting purposes.  Furthermore, the parties stipulated that for the purpose of analyzing Plan feasibility, the Millennium Loan should be valued at $2,252,600.

16.     Based on a $2,252,600 amount, the monthly payment to the Bank on the Millennium Loan would be $11,476.24.

17.     The Bank voted against the Plan and objected to the Plan on feasibility grounds. General unsecured creditors voted in favor of the Plan.

18.     At the final hearing, the Bank conceded that the Plan satisfies the "cramdown" elements of § 1129(b).[4]

_____

[4] Unless otherwise noted, all statutory references are to 11 U.S.C.

19.     The Debtor and New Mexico Taxation and Revenue ("TRD") stipulated that the monthly payment to TRD under the Plan on account of its priority claim should be increased to $4,082.08, and paid through October 2017.

20.     The Debtor's projections for future income and expenses are based on past performance.

21.     As of January 29, 2014 the Debtor had cash reserves of approximately $130,000.00.

22.     Post-petition, the Debtor paid its delinquent property taxes to Curry County and cured the delinquencies in franchise payments.

23.     The Debtor prepared a five year cash flow projection, attached as Exhibit B to the Debtor's disclosure statement (the "Cash Flow Projection").

### III.     Plan Confirmation

#### A.     Compliance with § 1129.

The Court has an "independent duty to ensure that the requirements of 11 U.S.C. § 1129 are satisfied, even if no objections to confirmation have been made." *In re Young Broad. Inc.,* 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010); *In re Williams,* 850 F.2d 250, 253 (5th Cir. 1988) (court "has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation"); *In re Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 653 (9th Cir. 1997) ("The bankruptcy court had an affirmative duty to ensure that the Plan satisfied all 11 U.S.C. § 1129 requirements for confirmation."); *In re Lett,* 632 F.3d 1216, 1220 (11th Cir. 2011) (same). Here, the Bank's objection to confirmation is limited to feasibility under

§ 1129(a)(11). Nevertheless, the Court will review the evidence to see if the Plan complies with the remaining requirements of § 1129.

B.    §§ 1129(a)(1)-(a)(7), (a)(9), (a)(10), and (a)(12)-(a)(16)

The Bank voted against the Plan, so the Court will analyze the Plan's compliance with §§ 1129(a)(8) and 1129(b) below.   Similarly, the "feasibility" requirement of § 1129(a)(11) is discussed separately.

At the final hearing, the Debtor presented Ms. Kaur's affidavit, which sets forth evidence that the Plan complies with the requirements of § 1129(a).   Ms. Kaur then testified that the statements in the affidavit were based on her personal knowledge and were true and correct.   The Bank did not question Ms. Kaur about any of the statements in the Affidavit, other than the statements relating to feasibility.

The Debtor also introduced into evidence a tally of ballots, together with the ballot of the unsecured creditor that voted for the Plan.

Based on the docket and the uncontroverted evidence provided by the Debtor, the Court finds that the Plan complies with the requirements of § 1129(a)(1)-(a)(7), (a)(9), (a)(10), and (a)(12)-(a)(16).

C.    § 1129(b) ("Cramdown" of Secured Claims).

Since the Bank voted against the Plan, confirmation is only available if the "cramdown" provisions of § 1129(b) are met.   Section 1129(b) provides in pertinent part:

> (b)(1)  Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property ….

As stated in *In re Inv. Co. of the Southwest, Inc.*, 341 B.R. 298 (10th Cir. BAP 2006):

Subsection (b)(2)(A)(i) of § 1129 in essence allows the plan proponent to write a new loan for full payment at a market rate of interest secured by the creditor's prepetition collateral.

341 B.R. at 318.

The Plan satisfies § 1129(b)(2)(A)(i)(I) because the Bank will retain the liens securing the Bank Claim and the SBA Claim. The remaining element ((A)(i)(II)) generally requires that a secured creditor receive "a market rate of interest" on its claim. *Id.* Ms. Kaur testified that the proposed rate of 4.75% is a current market rate of interest. The nondefault interest rate of the Millennium Loan is a floating rate of "Wall Street Journal prime" plus 1%. The Court takes judicial notice of the fact that on January 29, 2014, the published Wall Street Journal prime rate was 3.25%, so the note rate was 4.25%. The nondefault rate on the SBA Loan was 5.567%.

The Bank offered no contrary evidence, instead conceding that it had no substantial concern about the proposed interest rate. Based on the available evidence, the Court finds that the proposed 4.75% interest rate satisfies § 1129(b)(2)(A)(i)(II).

The proposed repayment term also must also be within market parameters. *See, e.g., In re Wise,* 2013 WL 2421984, at *5 (Bankr. D.S.C. 2013), citing 8 *Collier on Bankruptcy* ¶

1225.03[4][b][i] (16th ed. 2010). Debtor's proposed 30-year term is reasonably consistent with the loan terms when they were originated (24 years for the Bank loan and 20 years for the SBA loan).[5] Furthermore, the Bank again conceded that the repayment term did not stand in the way of confirmation. The Court finds that the repayment term complies with § 1129(b)(2)(A)(i)(II).

Finally, the Debtor must show that the proposed treatment does not "discriminate unfairly." § 1129(b)(2). There are no other substantial secured creditors.[6] The Plan proposes to pay the Bank's claims in full over time, with interest. The Plan also requires the maintenance of the Bank's collateral and the preservation of the franchise agreement. It is likely (there is no evidence in the record) that the Bank purchased the SBA Claim at a substantial discount. If so, payment of 100% of the SBA Loan would be a significant economic benefit to the Bank. Overall, the Debtor's evidence strongly supports a finding that the Plan does not discriminate unfairly against the Bank.

Based on this evidence, the burden shifts to the Bank to demonstrate that the Plain discriminates unfairly. *See In re Freymiller Trucking, Inc.,* 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (after prima facie showing of fair treatment, burden shifts to the creditor to demonstrate discrimination or inequity). The Bank provided no such evidence.

The Court concludes that the Plan satisfies the "cramdown" requirements of § 1129(b).

D.      § 1129(a)(11) ("Feasibility").

The Bank fought Plan confirmation solely on feasibility grounds. Section 1129(a)(11)

_____

[5] See the documents attached to the Bank's proofs of claim.
[6] TRD has a small secured claim (about $10,325). Curry County, New Mexico had a $32,577 property tax claim secured by a first lien on the Hotel real estate, but the claim was paid post-petition.

provides that a plan may only be confirmed if it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." The Bank argued in its objection and at the confirmation hearing that the Plan is not feasible.

"Feasibility is the shorthand term for the requirement of confirmation as set forth in § 1129(a)(11) . . . ." *Inv. Co. of the Sw.,* 341 B.R. at 310. The "Debtor bears the burden to show feasibility by a preponderance of the evidence." *Id.*

"The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises [sic] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985), citing *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). "In determining whether a plan is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *Id.*, citing *in re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1984). *See also In re Baker,* 302 B.R. 112, at *2 (10th Cir. BAP 2003) (plan is feasible if it "offers a reasonable prospect of success and is workable"). A debtor need not prove to a certainty that it plan will succeed. *Baker*, 302 B.R. 112, at *2. Rather, a debtor need only support its plan with "projections that have some basis in fact and experience." *Id.* at *3,* citing *In re Snider Farms, Inc.,* 83 B.R. 1003, 1012 (Bankr. N.D. Ind. 1988).

"Feasibility determinations must be firmly rooted in predictions based on objective fact." *Inv. Co. of the Sw,* 341 B.R. at 310, citing *In re Danny Thomas Props. II Ltd. P'ship*, 241 F.3d 959, 964 (8th Cir. 2001).

The Debtor's evidence supporting feasibility consists of the Cash Flow Projection; the

-8-

testimony of Ms. Kaur; the testimony of Ms. Amandi Dhillon (HMS's Vice President); and the Marketing Plan.

Ms. Kaur assisted in preparing the cash flow projections attached to the Debtor's Amended Disclosure Statement as Exhibit B (pages 2-5). The projections show stable revenue ($1,361,350 per year, which includes gross receipts tax and lodger's tax receipts) and operating expenses ($1,101,333.47 per year, which includes gross receipts tax and lodger's tax payments). The projected revenue figure is slightly less than the 2013 actual revenue figure shown in the Marketing Plan[7]. The operating expense projections are based on historical expenses and appear reasonable. The Debtor's cash flow projection shows a slow erosion in the Debtor's current cash balance of $133,759 over five years.

Ms. Kaur testified that the projections were conservative, and that she believed the Debtor would have more than enough money to make the Plan payments.

HMS has managed the Hotel for the last three years. HMS was retained initially because the Debtor was not in compliance with its franchise agreement. Since taking over management duties, the Hotel has been in compliance with the franchise agreement.

Ms. Dhillon prepared the Marketing Plan, which contains revenue information about the Hotel for 2011-2103. The Hotel's revenues increased from $1,125,831.42 in 2011 to $1,229,518.88 in 2013, a 9.2% increase. During that time the occupancy rate held steady at about 72.4%.

The Marketing Plan also contains data comparing the occupancy rate and average daily

---

[7] The revenue in the Marketing Plan does not include New Mexico Gross Receipts Tax or Lodger's tax, which total 12.8%.

rate of the Hotel to its competitors. It shows that the Hotel's occupancy rate lags the competitor's average rate of 74.5%. The Marketing Plan states that the Hotel's average daily rate is $84.97, while the average daily rate of the competition is $89.14.

The Debtor's strategy is to increase its average daily rate to that of the competition (about a 5% increase), while keeping occupancy steady. The data show that since 2011 the Debtor's average daily rate increased from $76.60 to $84.50, or 10%. Based on this and the other testimony of Ms. Dhillon, the Court finds that a further increase of 5% is reasonable.

Several adjustments should be made to the Cash Flow Projection. First, the operating expense deductions for gross receipts tax, lodger's tax, and franchise fees need to be reduced because there is an error in the method of their calculation.[8]

Second, as discussed above it is reasonable to increase the projected income by 5%, consistent with Ms. Dhillon's and M.s Kaur's testimony.

Third, the monthly payment to TRD should be increased from $2,894.23 to $4,082.08.

Finally, the monthly payment to the Bank should be increased from $11,476.24 to $11,704.29.

A cash flow projection with the adjustments outlined above is attached hereto as Exhibit A.[9] The Court believes that the revised cash flow projection is a reasonable estimate of future

---

[8] The Cash Flow Projection includes the taxes in the monthly income, and deducts the taxes as operating expenses. The tax deduction amount calculated is a flat percentage of the gross income, which results in a "tax on tax" error. For example, if the monthly gross revenue was $100,000, $88,642.66 of that amount would be guest receipts, while $11,357.34 would be taxes. Under the Debtor's formula, $12,812.50 was the calculated tax figure, an overstatement of $1,462.50. Further, the Debtor calculated franchise fees as a percentage of total gross revenue, when it should have been based on the hotel guest receipts only.
[9] The other figures in the revised projection are taken from the Cash Flow Projection.

-10-

income, expense, and Plan payments.  The revised projection shows that the Debtor would be able to fund the Plan obligations.

Further, the Debtor has some flexibility in its expenses.  This includes the following:

- The projection includes a monthly payment to Ms. Kaur of $4,500.  While her family needs the money, and the monthly payment is modest and reasonable, the Court believes she could and would delay or forego one or more monthly payments if she necessary to avoid default;

- The Kaur family now lives in California.  If necessary to conserve resources, they likely could move to Clovis, live in the Hotel, and take over the duties of the on-site manager;

- The franchise fee is based in part on revenue, so if revenues decrease, the franchise fee expense (an average of $19,285 per month) would decrease somewhat;

- Some other expenses vary based on occupancy (e.g. utilities) so a decrease in revenue would cause a decrease in utility expense; and

- There is flexibility in the timing of some of the projected expense payments.  For example, the line items for supplies ($9,000 per month), repairs and maintenance ($2,000 per month), and improvements (between $3,024 and $4,500 per month) likely could be adjusted for a month or two if needed to avoid default.

The Bank's evidence in support its feasibility objection was limited to cross-examining Ms. Kaur and Ms. Dhillon.  The resulting testimony was that there likely would not be much excess cash, so any unexpected significant downturn in revenue or increase in expenses could jeopardize the Plan.  The witnesses admitted this was so.  The Court agrees; there is no question

that the Plan is not risk-free. Nevertheless, overall the Court concludes that the Debtor has carried its burden to showing that the Plan "offers a reasonable prospect of success and is workable." *Pike's Peak,* 779 F.2d at 1460. The Plan is supported by "projections that have some basis in fact and experience." *Baker,* 302 B.R. 112, at *3. After reviewing the evidence the Court finds that the Debtor has met its burden demonstrating compliance with § 1129(a)(11).

IV. <u>The Motion to Dismiss is Denied</u>.

The Motion to Dismiss was premised on the argument that the Debtor could not confirm a plan. In light of the Court's ruling on this issue, the argument is not well taken and should be overruled. The Motion to Dismiss will be denied.

V. <u>Conclusion</u>

There is no guarantee the Debtor it will be able to complete its Plan payments, but the Debtor presented enough evidence and projections based in fact and experience that the Plan has a reasonable likelihood of success. In the past several years the Debtor has been able to stabilize its business and increase revenue, while holding expenses steady. There appears to be room for growth that is not included in the Debtor's conservative Cash Flow Projection. Finding that all of the elements of 1129(a) and (b) are satisfied, the Court will confirm the Plan. Debtor's counsel is instructed to submit a form of confirmation order to the Court, reflecting the approval of the Bank's and UST's counsel as to form. The Court will prepare and enter a separate order denying the Motion to Dismiss.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered on Docket: February 7, 2014.

Copies to:

R. Trey Arvizu, III
P.O. Box 1479
Las Cruces, NM 88004-1479

Wesley O. Pool
201 Innsdale Terrace
Clovis, NM 88101

Alice N. Page
U.S. Trustee's Office
P.O. Box 608
Albuquerque, NM 87103-0608

James C. Jacobsen
111 Lomas NW, Ste. 300
Albuquerque, NM 87102-2368

Revised Cash Flow Projection

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 |  | January-14 | February-14 | March-14 | April-14 | May-14 | June-14 |
| 2 | Cash Balance | 130,000 | 124,558 | 119,116 | 123,612 | 132,919 | 149,708 |
| 3 | Income - Net of Taxes | 93,818 | 93,818 | 106,802 | 113,085 | 122,858 | 127,977 |
| 4 | Oper. Exp.-Net of Taxes | 73,147 | 73,147 | 76,193 | 77,665 | 79,956 | 81,157 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 |
| 6 | Total Payments | 99,260 | 99,260 | 102,306 | 103,778 | 106,069 | 107,270 |
| 7 | Profit (Loss) | (5,442) | (5,442) | 4,496 | 9,307 | 16,789 | 20,707 |
| 8 | Cash Balance | 124,558 | 119,116 | 123,612 | 132,919 | 149,708 | 170,415 |

Revised Cash Flow Projection

| | A | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|
| 1 | | July-14 | August-14 | September-14 | October-14 | November-14 | December-14 | 2014 Year End Totals |
| 2 | Cash Balance | 170,415 | 200,030 | 194,588 | 189,146 | 183,704 | 178,262 | 172,820 |
| 3 | Income - Net of Taxes | 139,611 | 93,818 | 93,818 | 93,818 | 93,818 | 93,818 | 1,267,059 |
| 4 | Oper. Exp.-Net of Taxes | 83,883 | 73,147 | 73,147 | 73,147 | 73,147 | 73,147 | 910,883 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 313,356 |
| 6 | Total Payments | 109,996 | 99,260 | 99,260 | 99,260 | 99,260 | 99,260 | 1,224,239 |
| 7 | Profit (Loss) | 29,615 | (5,442) | (5,442) | (5,442) | (5,442) | (5,442) | 42,820 |
| 8 | Cash Balance | 200,030 | 194,588 | 189,146 | 183,704 | 178,262 | 172,820 | 129,487 |

Revised Cash Flow Projection

|  | A | O | P | Q | R | S | T | U |
|---|---|---|---|---|---|---|---|---|
| 1 |  | January-15 | February-15 | March-15 | April-15 | May-15 | June-15 | July-15 |
| 2 | Cash Balance | 129,487 | 124,045 | 118,603 | 123,099 | 132,406 | 149,195 | 169,902 |
| 3 | Income - Net of Taxes | 93,818 | 93,818 | 106,802 | 113,085 | 122,858 | 127,977 | 127,977 |
| 4 | Oper. Exp.-Net of Taxes | 73,147 | 73,147 | 76,193 | 77,665 | 79,956 | 81,157 | 81,157 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 |
| 6 | Total Payments | 99,260 | 99,260 | 102,306 | 103,778 | 106,069 | 107,270 | 107,270 |
| 7 | Profit (Loss) | (5,442) | (5,442) | 4,496 | 9,307 | 16,789 | 20,707 | 20,707 |
| 8 | Cash Balance | 124,045 | 118,603 | 123,099 | 132,406 | 149,195 | 169,902 | 190,609 |

# Revised Cash Flow Projection

|  | A | V | W | X | Y | Z | AA |
|---|---|---|---|---|---|---|---|
| 1 |  | August-15 | September-15 | October-15 | November-15 | December-15 | 2015 Year End Totals |
| 2 | Cash Balance | 190,609 | 195,105 | 189,663 | 184,221 | 178,779 | 173,337 |
| 3 | Income - Net of Taxes | 106,802 | 93,818 | 93,818 | 93,818 | 93,818 | 1,268,409 |
| 4 | Oper. Exp.-Net of Taxes | 76,193 | 73,147 | 73,147 | 73,147 | 73,147 | 911,203 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 313,356 |
| 6 | Total Payments | 102,306 | 99,260 | 99,260 | 99,260 | 99,260 | 1,224,559 |
| 7 | Profit (Loss) | 4,496 | (5,442) | (5,442) | (5,442) | (5,442) | 43,850 |
| 8 | Cash Balance | 195,105 | 189,663 | 184,221 | 178,779 | 173,337 | 173,337 |

Revised Cash Flow Projection

| | A | AB | AC | AD | AE | AF | AG | AH |
|---|---|---|---|---|---|---|---|---|
| 1 | | January-16 | February-16 | March-16 | April-16 | May-16 | June-16 | July-16 |
| 2 | Cash Balance | 173,337 | 167,895 | 162,453 | 166,949 | 176,256 | 193,045 | 213,752 |
| 3 | Income - Net of Taxes | 93,818 | 93,818 | 106,802 | 113,085 | 122,858 | 127,977 | 139,611 |
| 4 | Oper. Exp.-Net of Taxes | 73,147 | 73,147 | 76,193 | 77,665 | 79,956 | 81,157 | 83,883 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 |
| 6 | Total Payments | 99,260 | 99,260 | 102,306 | 103,778 | 106,069 | 107,270 | 109,996 |
| 7 | Profit (Loss) | (5,442) | (5,442) | 4,496 | 9,307 | 16,789 | 20,707 | 29,615 |
| 8 | Cash Balance | 167,895 | 162,453 | 166,949 | 176,256 | 193,045 | 213,752 | 243,367 |

Revised Cash Flow Projection

| | A | AI | AJ | AK | AL | AM | AN |
|---|---|---|---|---|---|---|---|
| 1 | | August-16 | September-16 | October-16 | November-16 | December-16 | 2016 Year End Totals |
| 2 | Cash Balance | 243,367 | 237,925 | 232,483 | 227,041 | 221,599 | 216,157 |
| 3 | Income - Net of Taxes | 93,818 | 93,818 | 93,818 | 93,818 | 93,818 | 1,267,059 |
| 4 | Oper. Exp.-Net of Taxes | 73,147 | 73,147 | 73,147 | 73,147 | 73,147 | 910,883 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 313,356 |
| 6 | Total Payments | 99,260 | 99,260 | 99,260 | 99,260 | 99,260 | 1,224,239 |
| 7 | Profit (Loss) | (5,442) | (5,442) | (5,442) | (5,442) | (5,442) | 42,820 |
| 8 | Cash Balance | 237,925 | 232,483 | 227,041 | 221,599 | 216,157 | 216,157 |

## Revised Cash Flow Projection

| | A | AO | AP | AQ | AR | AS | AT | AU | AV |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | January-17 | February-17 | March-17 | April-17 | May-17 | June-17 | July-17 | August-17 |
| 2 | Cash Balance | 216,157 | 210,715 | 205,273 | 209,769 | 219,076 | 235,865 | 256,572 | 277,279 |
| 3 | Income - Net of Taxes | 93,818 | 93,818 | 106,802 | 113,085 | 122,858 | 127,977 | 127,977 | 106,802 |
| 4 | Oper. Exp.-Net of Taxes | 73,147 | 73,147 | 76,193 | 77,665 | 79,956 | 81,157 | 81,157 | 76,193 |
| 5 | Plan Payments | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 | 26,113 |
| 6 | Total Payments | 99,260 | 99,260 | 102,306 | 103,778 | 106,069 | 107,270 | 107,270 | 102,306 |
| 7 | Profit (Loss) | (5,442) | (5,442) | 4,496 | 9,307 | 16,789 | 20,707 | 20,707 | 4,496 |
| 8 | Cash Balance | 210,715 | 205,273 | 209,769 | 219,076 | 235,865 | 256,572 | 277,279 | 281,775 |

Revised Cash Flow Projection

| | A | AW | AX | AY | AZ | BA |
|---|---|---|---|---|---|---|
| 1 | | September-17 | October-17 | November-17 | December-17 | 2017 Year End Totals |
| 2 | Cash Balance | 281,775 | 281,775 | 277,521 | 273,267 | 269,013 |
| 3 | Income - Net of Taxes | 93,818 | 93,818 | 93,818 | 93,818 | 1,268,409 |
| 4 | Oper. Exp.-Net of Taxes | 73,147 | 73,147 | 73,147 | 73,147 | 911,203 |
| 5 | Plan Payments | 26,113 | 24,925 | 24,925 | 24,925 | 309,792 |
| 6 | Total Payments | 99,260 | 98,072 | 98,072 | 98,072 | 1,220,995 |
| 7 | Profit (Loss) | (5,442) | (4,254) | (4,254) | (4,254) | 47,414 |
| 8 | Cash Balance | 281,775 | 277,521 | 273,267 | 269,013 | 269,013 |